Thank you, Your Honor. May it please the Court, Kristen Benesky from the Washington Attorney General's Office, speaking for the petitioners. This case is about the Federal Railroad Administration acting beyond its limited powers and violating the plain text of its own enabling statute and the Administrative Procedure Act. In 2016, the agency proposed a regulation that would have raised safety standards nationwide by requiring at least two crew members on most trains. But the 12-month statutory deadline to complete the rulemaking came and went with no final rule. Over two years after that deadline passed, the agency issued a surprise rule that deregulated train crew staffing and prohibited states from enforcing their own crew size requirements. Commenters had expected, if anything, a rule that raised safety standards, but instead they got a rule that killed state safety regulations. Let me ask you a couple of questions here. First, the time limit, do you have any cases that said if you go beyond the time limit that it's like a statute of limitations and we're over and done? No, Your Honor, but the plain text of the statute is very clear and under Chevron, when that's the case, if the agency violates the plain text of the statute, that's the end of the matter and the agency action is invalid. The agency also did not cite any record evidence supporting the preemption of state law and did not weigh the costs and benefits of preemption. In fact, the agency said the impact of train crew size on safety was inconclusive, even after it supplemented the record with comments from a totally separate proceeding. It looks like, okay, we get these cases where we go from administration to administration and administrations change their policies, which they can, but they have to explain why they changed them. So was this rule proposed under Obama and then it was pulled under the Trump administration? Do I have that correct? That's correct, Your Honor. And in fact, what happened was because of the 12-month deadline to complete a rulemaking proceeding, by operation of law, when that 12-month period ended, the proposed rule was effectively withdrawn. The issue here is that way later down the line, the new administration's FRA decided to preempt state law without ever having given notice of its intent to do so. Okay, do you dispute the fact that they can negatively preempt? Can the FRA do that? Yes, Your Honor. The FRA has authority to preempt state law, but it can only do so when it affirmatively decides that that's appropriate based on the record and when it complies with all applicable procedural requirements. And that did not occur here. Well, let me ask you this. Okay, so if they withdrew this, it was a two-person, it was two-person and the proposed rule. Before that, so the existing rule right now is one person max? Is that the existing rule right now? No, Your Honor. The existing rule is there is no rule. There's no regulation in this area whatsoever. So not even one person? That's correct. So if let's say if someone decides they just want to run a train completely by with no one on it, can they do it legally now, right now? Yes, Your Honor. Okay, so that kind of doesn't sound like a great idea, but without some input here, but so how does the, but there's also the safety regulations, right? Which regulations are you referring to? Besides what the FRA can purport, there are, there can be state safety regulations, right? Under this rule, there cannot be any state regulation. So, okay, if let's just say if the FRA, you have conceded that they can negatively preempt, okay, how could they, under your theory of the case, how could they have legally done it in this way? They simply would have had to issue a new notice of proposed rulemaking, complied with the time limitations, given meaningful notice to the public of what they were proposing to do, and then provided an opportunity to comment and consider any serious issues raised by those comments. And the agency could still do that now, if the court were to vacate this rule based on all of the procedural violations, the agency could still go back and issue a new notice of proposed rulemaking, as long as it complies with the APA and with the Safety Act. So, negatively preempting, if it's a legal, if it's a legal rule, they can negatively preempt, why do you have to ask for comment on that? Because that's what the Administrative Procedure Act requires. The agency has conceded that what it did here is a final agency action subject to judicial review under the APA, and the APA requires that any agency action comply with applicable procedural requirements, and that it cannot be arbitrary, and it has to be preceded by notice and comment, and then followed by consideration of those comments by the agency. I have one more question, and Judge Rakoff, I know you're trying to, and then I will. No, it's Judge Christin who's trying to get a word. Okay, I just have one more question, then I'll go to you, Judge, and I'll turn it over. I have, there's also a challenge that the unions aren't in the right place here, okay? So, which might be true. So, let's say if we agreed with you, what do we do with the, but we agree that they're in the wrong place, what do we do with that petition? Well, Your Honor, first of all, these cases have been consolidated, so we think it is appropriate to decide all of them here, but if the court wished to not decide the unions petition, we'd still be asking this court to vacate the unlawful agency action, and so either way, if the court were to grant that relief, then the rule at issue here would go away and effectively moot out the unions separate petition. Okay, Judge Christin, I see, so you have as much time as you want. Thank you, I'll just be brief. Counsel, I think the confusion is that the first time Judge Callahan asked you the question about the agency's ability to preempt, you said that they would need to affirmatively express that intent and then basically abide by the APA, but you're really relying on the APA, right? They did affirmatively express their intent to preempt, so it seems to me that all of the other arguments, although they may be well taken, I'm not trying to telegraph a punch here, it's just that that's what your argument boils down to. They'd have to do it over again and comply with the notice and comment, all the public procedures required by the APA, right? Yes, that's absolutely correct, Your Honor. We are not challenging the agency's authority to negatively preempt. Thank you. I see that my time is running low, so unless there are any other questions, I will go ahead and turn it over to Mr. Broder. Let me see, do either of my colleagues want to ask additional questions right now? Nope. Okay, since we took a fair amount of your time, I'll leave you four minutes for rebuttal. Okay. Thanks. All right, Mr. Broder? May it please the Court, my name is Kevin Broder. I represent, I'm arguing today on behalf of the U.N. petitioners on the state of, the issue of state preemption. And I think the question here really is, is the FRA attempting to expand its authority beyond what Congress has granted? The FRA not only withdrew, which we don't dispute the fact that it can withdraw a notice of rulemaking. It's done that in the past. But it goes on to say that not only are we withdrawing, but we're also telling the states that they can't do anything. Now the question is, can the FRA do that? Now they, in their withdrawal notice, they said that we're withdrawing, and because the data says, well, it's inconclusive. We can't really come up with a rule. Or it's insufficient. We really can't come up with a rule. And we're not going to issue a rule at this time, which means, well, maybe we might issue a rule sometime later. So the FRA has been somewhat vague in the situation, in the decision, but it has not issued a rule. Excuse me. I'm not sure what's vague about this. Maybe inconsistent. Are you arguing inconsistency? I'm just not understanding why you're arguing vagueness. No, I would certainly agree that they are inconsistent. When you look at what the notice was in 2016, with regard to how the rule was supposed to be structured and what they were looking for, the rule in 2016, the notice of proposed rulemaking in 2016, was such that the default will be a two-person crew. Then, if the carriers wish, they can, at whatever point, request a waiver to go to one-person crews. But the default is two. And the notice of proposed rulemaking in 2016 was extremely long. Counsel, I don't want to take a whole lot of your time, because I think we understand this part very clearly. My question was very discreet, and that is, it seems to me that you're arguing an inconsistency and not vagueness. But if you're arguing vagueness, I would appreciate you explaining that to me. I'm not trying to be hyper-technical. No, I appreciate the question, and maybe I did misspoke. I'm not necessarily saying it's vague, but it's certainly inconsistent. Do you agree that if the unions were the only plaintiffs or petitioners here, that they would be in the wrong court? Would we be in the wrong court? Yeah. If the states were not here? Yeah. Well, we do have representation here. We have members here. I think we certainly have an interest here. Well, that's not the question, though. It's that they don't have their main office here. No, we do not have our main office. I mean, federal courts kind of take their jurisdiction pretty seriously. So, I mean, I think it's safe to say someone here belongs here. But are the unions – if they were the only ones, like Judge Raycroft said, would we have to either transfer it or dismiss it for lack of jurisdiction? Well, if the unions were the only ones here, yeah, the proper course probably would be to transfer it to the Sixth Circuit. But that's not what this case is here sitting now. It's that the states are here. We're here. It would certainly not make sense to send us to the Sixth Circuit while this case is pending here and have the Sixth Circuit decide a case which could potentially lead to conflicting resolution. Hypothetically, if you were to win here, is then the jurisdiction of the union somewhat moot? I mean, is there anything to transfer to the Sixth Circuit? I'm sorry. I missed the first part of the question. Well, hypothetically, if you were to win here – I'm saying hypothetically. We have not conferenced on this case, so I don't want you to get all excited. I'm saying hypothetically. If you were to prevail and we were vacated, can we just dismiss the unions as not being in the proper venue? Or do we have to transfer something? Or is it moot? They're asking for the same thing you're asking for, right? No, I think if the petitioners prevail here, that is prevailing for all petitioners, whether it's the union or the states. Because the prevailing remedy would be the vacature of the regulation, and that's what we're both asking for. So if the court here decides that vacature is the proper remedy, that would answer the issue for us and the states as well. Counsel, we have to address jurisdiction first. And you know what your opposing opponent is going to say because he said it in his brief. So since you're at the microphone, could you speak to this? They've accused the unions of forum shopping. And because you filed first, they string out an argument that really, you know, we have to deal with that first and either dismiss or transfer you, your client, rather than treating them as an add-on because of the first filing and the statutory requirement the record be transferred. So I'm summarizing. But could you respond to that argument, please? The fact that we filed first was, I mean, we looked at the situation of where it would be. And it made sense to file in the Ninth Circuit because you had state petitioners there as well, because their cases would have been affected. We didn't. It wasn't forum shopping. It's where they're going to be. They're going to certainly challenge the cases. You're referring now to California and Nevada and Washington. Was the expectation was already an expectation they were going to file or can you flesh that out for me, please? Yes, I believe that there was an expectation that they would be found. But we have an amicus brief by I don't know how many other states. Was there no expectation this was going to be filed in other circuits or. Not that I was aware. All right. Thank you. All right. I see my rebuttal time is. Judge Callahan, I think, is on. Yeah, we're having the same problem, Judge Callahan, that we had before. It's not you're not a mood, it's just there's a connection. I think maybe what you have to do is restart. Yeah, I'm sorry, Judge. It looks like it's the same issue that happened before. OK, she's on the way back. The equipment that we're using is provided by the federal government. I mean, that presumably explains everything, right? I really want to apologize. We've had my experience of a really seamless arguments since March with very, very few exceptions. But today we're hitting some bumps. So I'm sorry for that. So that's an alternative explanation. That's what you get for inviting someone from outside to sit on your court. That must be it. That must be. No, no, we have, as you know, many, many visiting judges. What I worry about is the time zone difference. Sometimes when we get into the afternoon, I think, oh, my goodness, we have to. These people need to go get dinner. These people on the East Coast. Here, I think, is Judge Callahan. OK, I can't. I'm going on my iPad. I've never had this problem on my computer. So I'm just going to use my iPad here. You're back. OK, are we in court? Yes. Clock's not running yet. OK, but they're not coming. Is our tech coming on? Can our tech come on? Now we're ready. Yes, Judge, I'm here. OK. All right. The court says I've never had this problem. All right. I apologize. I don't know. I'm on my iPad now. So let's see if that is better. OK. OK. So, Mr. Broder, did you have anything else right now? No, I wanted to reserve my remaining time. OK, so you have three minutes and 32 seconds. OK, then we'll go over to the respondents or appellees. All right. Good morning. Go ahead. Good morning, Your Honor. May it please the court. Martin Totaro on behalf of the federal respondents. This case concerns the preemptive effect of the Federal Railroad Administration's decision to withdraw a proposed minimum crew size rule because the agency concluded that the record did not support regulation covering that subject matter. As this court held long ago in its Marshall decision, when the FRA decides not to regulate, that decision precludes states from regulating on the same subject. Petitioners raised procedural and substantive challenges to the agency's withdrawal, and I'll go through them. None has merit. Turning to the timeliness issue, the Supreme Court has explained that if a statute does not specify a consequence for noncompliance with the statutory timing provision, the agency does not lose the ability to act. That is the square holding of Peabody Cole. And that is precisely the case here. Excuse me. Could I ask a follow-up question about that? It seems that there are many other consequences, counsel, from comments getting stale. That's my word. Right. I appreciate the rule from Peabody, but I worry then about a circumstance where we're talking about an agency dedicated to regulation for purposes of safety, and we're talking about regulating crew size, and the agency seems to be relying pretty heavily on technological innovations, which sometimes look really good until planes start to fall out of the sky because we thought certain software was going to do something that it didn't do, for example. Sometimes that feedback from the field is very, very important. So even in light of the rule in Peabody, doesn't the staleness of the, again, my word, the dated nature of these comments come back and bite you when we talk about notice and comment? So two points, Your Honor. The first point is that type of staleness challenge is not at issue in this case because it wasn't raised by petitioners, which provides pretty good evidence that the comments are not stale. And the second point is that I can imagine a scenario where if comments were stale, that could inform the nature of a court's reason, decision-making analysis. But the black letter rule from cases like Peabody Coal is that an agency does not lose the ability to act when these types of statutory timing provisions are not followed. And I want to just be crystal clear. I gave you the Peabody rule. I'm just asking whether it comes back when we look at the, whether the notice and comment period was fair and adequate. And is your answer to that? It could, but it doesn't hear because they didn't argue it. Judge Kristen, I could imagine that it would inform not the procedural aspect of the sort of logical outgrowth, but I could imagine that in the relevant case, it could inform a substantive challenge to the rule if the agency isn't. And so that's just what I was getting at. And so I want to be clear here. We are unaware of any case. Where a court is vacated a rule or invalidated a withdrawal based on the agency, missing a deadline. And this court's. Let me ask you this, Mr. Totaro. It seems so that you've, you've changed course. I mean, I I've heard. Ms. Benesky said, Hey, you can, you can negatively preempt. They don't dispute that. You can, you can do what you want to do, but you just didn't do it. Right here. Why is this not a change in an administrative policy? To me, it looks like if I look like, okay, that's why I, I, we regularly see cases where one administration does one thing. Then a new administration comes in, takes a different view. And they can change that. That, that is. It's it's okay to do that, But they have to explain why they're changing. And you have a couple of Supreme court cases recently where the U S Supreme court has not gone along with the government because like regions is one. Where they said you didn't explain adequately. Why you were changing. And so why isn't this a problem here? A few points, your lawyer and the new lawyer said, Hey, we don't need to have any role on this. And let's, and we're gonna, and we're going to tell the states they can't do anything. And now people can, if they want, they can just. The trains don't need to have anyone on them. That doesn't seem like a good idea. A few points, your honor. First, the cases you cited, those are talking about when an agency changes an official policy. And I'll set that point aside for a moment. Second petitioners drastically overstate the extent to which the agency made a decision in its March, 2016 proposed rulemaking. The rule itself was incredible. The proposed rule. The comments in the rule were very tentative. So on page 12 of the excerpts of record, for example, the agency says it does not have data. To prove a direct correlation between higher rates of safety and multiple person proves. And if you go on to page 14, there is no. You wait for two years and you don't do anything. And then suddenly you come out. To me, it looks like a new lawyer looked at it and said, Hey, I've got an idea. Let's just pull the rope. Let's just pull the roll and then tell the states they were negatively preempting them. Two points, your honor. So what the agency did here in 2016 was to provide the public. With notice that it sought a proposed rule that had many exceptions. And it asked the public for actual evidence, supporting the safety of the proposed rule or the lack of safety in the absence of a rule. It did not get any of that. Judge Kristen. I'm sorry. I'm sorry. I'm forgive me for interrupting. Zoom is difficult and I didn't interrupt you. Go ahead. And then I'll, I'll ask my question later. And so the agency asked the public for that information, that information did not come in. So then the agency decided to withdraw the proposed rule, explaining that the evidence simply did not come in. And that decision is on all fours with what this court has already did already decided in its Marshall decision in 1983. There you had a proposed rulemaking. That said, We are operating on the presumption that it is safer to have flashing lights at grade crossings, but we don't have evidence yet. And so public tell us if that's correct. The comments they received could not substantiate that assumption. And so the agency said, the evidence does not conclusively establish that flashing lights at great crossing it's safer at crossings are safe. And so we're withdrawing the rule. And this court held that the effect of that withdrawal is to preempt states from having the ability to regulate on the same subject matter. And so if I could. It's a very different point. And the point that I'm trying to get you to back up and address is that, and you know, this because it pulls up opposing council certainly has this in their briefing. When your brief stresses, as you just did that, the agency didn't get comments. Yeah. Obvious responses. That's because the agency was asking a different question and proposing a very different rule. Your honor, The agency was asking for comments on the safety of a minimum crew member rule. All of the comment. Step back for a moment. No petitioner has said that they could have offered any sort of different comment. Had they decided to comment earlier on the preemptive effect of a potential withdrawal. So I don't think the evidence. There's a degree of specificity. I mean, it is. And it just all focuses on that. As far as I'm concerned. And I just want to give you the best chance to respond to this, but it's not adequate for the agency to say, Hey, we're good. We're going to propose a rule that has something to do with trains. That would be too vague. And then we just sort of drill down from there, but the, of course, and my hypothetical is silly, but you've drilled down. And what the public was on notice of was a very different proposal. Right. You went from a minimum to a maximum. I just want to give you the best chance to speak to this, but on my scorecard, this is a big problem. Your honor, two responses, a factual response and a legal response. The factual response. So the notice itself squarely put the issue of crew staffing on the table. It didn't just impose flatly. Two member cruel crew requirement. It instead proposed two different options and three different alternatives. And one of the alternatives wouldn't even have required railroads using fewer than two individuals as crew members to obtain agency permission to do so. That's on page 51 of the record. The notice also said that this proposed rulemaking could have preemptive effect. That's on page 55 of the record. And the comments received during the comment period. Recognized that whatever the agency did could have preemptive. Our case law establishes that we know that the agent is not even contested that what the agency does could have preemptive effect. The question is, what did they give the note public notice? They were contemplating doing. And so on that point, your honor, Long Island care from the Supreme court tells us that withdrawing a rule can have legal consequences. And just as on point, this court's decision in Marshall says, when you decide to terminate a rulemaking, Regardless of whether that particular option was specified in the notice of proposed rulemaking, that decision can have preemptive effect. And so in light of Marshall in light of Norfolk and Western from the sixth circuit, in light of Doyle from the seventh circuit, we know that preemption negative preemption is always on the table. When the agency decides to regulate or not regulate, if it makes a considered decision. Let's not contest it. Opposing counsel said she doesn't contest that and they're not contesting the agency's ability to withdraw the proposal. The question is where was the public on notice of this proposal? And your honor, the same could be true. The same could be said in this court's decision in Marshall and this court's decision in Burlington Northern. If I could take a step back, the key point is that in this unique area, and I want to stress how unique this particular area is under this statute where there is an express preemption provision. The title of the statute says nationally uniform. It's to the extent possible. And this court's decisions squarely holding that regardless of any notice, when the agency decides to regulate or not regulate, that could have preemptive effect. And so everyone knows when this particular agency decides to look at an issue, if it's going, the, the express preemption provision is at issue. And if the agency decides not to regulate this holding is the square point, the square holding of this court's decision in Marshall, that carries preemptive consequences. All right. If you had where, so where was, where was without this rule, what's the status of the law? I'm sorry, your honor. I don't think I understand. Without you withdrew the prior to proposing this rule, what was the status of the law? Yes, your honor. I apologize. This is an issue that has always been up for collective bargaining. And, and it was before 2016 and it will be after 2020. If the court decides in our favor, the one difference is that following this court's decision in, in Marshall, the agency's decision not to regulate also precludes states from doing so. And so state laws to the contrary that we list some of them at the end of the withdrawal would be preempted. So what about the union and jurisdiction on the union? If you lose on three petitions, what do we do with the union's petition? I'm saying hypothetically. Your honor. I think the union should either be dismissed altogether and the court should just proceed to address these issues that have been squarely raised or this court doesn't even need to dismiss the unions. There's a case from this court. We discuss in our brief railway labor executives association that says that the court doesn't need to examine venue for a party that has standing when standing and venue are proper for another party. And that seems to be clearly what we have here. The one issue that I would just flag that intervenors also pointed out on pages eight, 19, and 20 of their brief. Is that transferring the unions to the sixth circuit would be quite messy because under the transfer statute, then there's a pretty good argument that the other cases would have to get transferred to which would just be kind of a difficult situation that took me at least a while to wrap my head around. So I think the critical point is that the union should be dismissed and the case should proceed or the court should just apply its precedent from railway executives. The critical point is that regardless of whether the unions are in or not, this court can address the issues. Okay. Thank you. Do either of my colleagues have any additional questions of this? No, no. Thank you very much. Okay. We've used your time. So now we'll go to Mr. Dupree. You have seven minutes. Thank you, your honor. Tom Dupree on behalf of the intervenor, the association of American railroads and may it please the court, your honors. What happened in this rulemaking was actually fairly simple. The federal railroad administration issued a proposed rule requiring a minimum crew size, but in the NPRM, they expressly questioned whether such a rule would actually benefit safety at that point. Ordinary rulemaking process went forward parties, including my clients put into the record extensive evidence and data demonstrating overwhelmingly that requiring a minimum crew size would not have any safety benefit. And in fact would impose significant costs, both in terms of saltifying innovation, increased labor costs, increased burdens on the industry. When it had that additional evidence, FRA declined to issue the rule we submit. That was a rational decision. It certainly was not arbitrary. And of course, under this court's precedent in Marshall and Burlington Northern and other cases, when an agency expressly declines to regulate in an area, in this case, FRA expressly declines to exercise its regulatory authority that has preemptive effect. So judge Kristen, to your point, all parties were on notice that one possible outcome of this rulemaking could very well be that the agency would conclude as it did,  conclude the argument. What's your best argument? They were on notice of this outcome. Please. Our best argument is simply that when they issued the NPRM, they openly questioned whether there was any evidence justifying this rule in terms of delivering a safety benefit. They said that in the examinations, I don't want to use a lot of your time, but I'm really asking for a site into the record. Where's your, where's your best shot? Well, I think it's in the background section, your honor right on ERS one and two, when it explains the history of this rulemaking. And it says that over the years, the agency had been unable to identify any evidence showing that a minimum crew size requirement would boost safe. That was the reason for which it convened this RSAC, this advisory conference process. And then when that came up empty, they commenced this rulemaking. And as part of that rulemaking, and I would also refer your honor to the NPRM itself, because time and again in that NPRM, the agency says we don't have any evidence showing that minimum crew size will benefit safety and invited parties to submit data to that point, which we did. If your honor looks at the supplemental excerpts of record, you will find, we put into the record, six exhibits, studies, data reports, affidavits from people who have been running one person operations perfectly safely over the years. And so the agency acted quite reasonably when it looked at the data and the evidence in the record and said, there is absolutely no safety benefit that we can discern from imposing this regulatory mandate. And at the same time, there are significant costs. I have reviewed the excerpts. My question, you realize it's different. My question is what's your best shot that people were on notice of this outcome when it was, when they were given, when, when comments were solicited, have you answered the question? Well, I, your honor, I think I have, but that is the question. I understand your honor. And it's, it's in the background section. The other places I would refer your honor to are on page 51 to 52 of the excerpts of record. That's from the NPRM where the agency specifically put on the table, an outcome that is substantively indistinguishable from what it ultimately did. The alternative that the agency put on the table in the NPRM said that railroads can just move ahead with one person operations. The agency will monitor it. If there's a problem, they can step in, but it essentially would have given the industry the green light to move ahead with one person operations. And so to the extent that the petitioners are complaining that they were caught off guard by this outcome where the railroads could move ahead with one person operations that was expressly proposed in the NPRM. In addition, in the NPRM, they cited multiple times, the possibility that this rulemaking could result in preemption of state law. But your colleagues on the other side are telling me that there's nothing to present to prevent operating a train with no one on board. And your honor to that, I would make several points. One is that as a practical matter, right now, the industry is constrained by collective bargaining agreements that as over the, since time immemorial, that has been, what is determined to cruise size. So it's not as though if all of a sudden the railroads wanted to move to autonomous operations tomorrow, they could, you can't second point FRA. I really can't concern. I can't concern myself with that. Can I? Well, if the debate was, if the debate was, it's we're debating a minimum of two, but they withdraw that. But what I'm, what I'm told is after this, there's no minimum. So it could be zero. Would the question be different? Your honor. My answer is, is, is twofold. One is that they are constrained, not just by whatever federal or state regulations could be out there, but by collective bargaining agreements. My second point is that the federal railroad administration oversees rail safety. It has a forest of safety regulations that specify what train operators have to do, what railroads have to do to ensure safe operations. And if a railroad were to want to move to some sort of autonomous operation, they would need to make sure that they're having a little trouble with you. Just hold it. I'm sorry, your honor. I was going to say they would need to make sure they could satisfy all of those safety regulations in order to have safe operations. Keep in mind that the federal government has never issued. So I think we've lost judge Callahan. Can you hold up? I want to make sure she hears your argument. Judge Callahan, you look frozen on my end of the screen. All right. Just hold this pretty well. Judge Kristen, can you hear him? I can hear him and I can hear you. Judge Maycock's nodding his head. He can hear too, I think. Yes. But Judge Callahan, you look frozen now. You were frozen for me for a while. Now I'm hearing you. I think you're unfrozen now. So. So I proceed. Yeah. Why don't you restore some time to Mr. Dupree because we lost him for a bit. Just for the record, I didn't lose you. I was able to hear your entire argument, but I don't think Judge Callahan could. So I don't I wanted to make sure she didn't miss it. I heard your whole argument, but I don't understand the first point about the fact that. Unionization has. Created a situation where you can't be run an automated train or whatever that can. As we saw in the airline industry, that can change with the wind. And that's not what this agency is all about. And indeed, the unions, while safety may be part of their concern, the unions also are concerned with the economics of the situation, which, again, is not the what we're asking you about, which is the safety part. So I don't see the force of your first argument. You were in the middle of your second argument when I think Judge Callahan got got. Frozen. Well, thank you, Judge Rakoff. And I won't belabor the first argument. It was only in response to I think it was Judge Callahan's question about whether the industry say tomorrow could move to all autonomous operations. And I was just saying that's not a practical possibility given the constraints imposed by collective bargaining agreements. But I take your honor's point. And to your honor's point, I think my second point has more force. And it's this. The Federal Railroad Administration has a force of safety regulations that ensure safe operations, even though they are not specifically directed to minimum crew size. So many of these regulations under current technological, you know, what prevails in the industry may not be able to be accomplished unless you have a person or maybe in some cases two persons in the locomotive. And so my point is that if this court were to sustain FRA's order, it's not as though it's creating some sort of regulatory free zone. The fact is, is the federal government has not regulated minimum crew size ever for decades. And the rail industry safety record has been getting better and better and better year after year. And so vacating the FRA's order, it's not as though that would somehow restore the status quo. FRA has never regulated in the area of minimum crew size. And the result, which is in the record, is increased safety performance year after year after year. If I could, in my remaining time, just quickly touch on Judge Kristen, you, Your Honor, had asked some questions about timeliness requirement. I think here the simplest answer is the other side has plainly forfeited that. They never argued before the agency when the rulemaking was was pending and there was no issuance from FRA. They never said, wait a minute, we've got some new data that we want the agency to consider. Nor after the agency withdrew its order, did they go back to the agency as they're entitled to do under the agency's regulations, seek reconsideration based on new evidence that wasn't before the agency. They forfeited there too. And even in this court today, I'm not aware that they're arguing that they have some new data or reports that change the outcome. I take Your Honor's point that there could be a case where that happens, where there's some new data over the last two years that the agency needs to update to make sure it wasn't basing its rule on a stale premise. But that's not this case. The other side isn't even arguing that. I would like to ask one more question and your time is up. So I'm going to interrupt you if I could, please. You've made this point and I think forcefully in your briefing as well that the safety record, the track record, no pun intended for this industry has improved consistently over time in the absence of a national rule regarding crew size. But does the record tell us whether the states have been filling that gap and requiring a particular crew size? Well, I guess two points, Your Honor. One is, I believe the current number, at least based on the time of the rule, there were approximately 10 states, give or take, that had enacted minimum crew size laws. So the vast majority of states were not or have not yet legislated in this area. Again, as at the time of the NPRM. But some have, is my point, I think. And so that's what I'm trying to get at. I don't know what to attribute the improved safety record. I don't know what to attribute that to, is my only point. And if you've got something you want to point me to, I'm all ears. I think it's just with the advent of technology and the fact that railroad industry trains can do many more things now autonomously and through automated mechanisms than they could previously. And one of their causes in the industry of accidents and mistakes is human error. And so when you have a regime that automates things, it eliminates the possibility of human error. And if you look at the size of train crews over the decades, it has steadily decreased, decreased, decreased. At the same time, the safety record of the industry has increased, increased, increased. So counsel, again, you're over your time. I think the answer to my question is, yes, but I don't want to get in trouble with Judge Callahan and I'm taking you. No, it's OK. Right. Yes, Your Honor. And I would also refer your honor to exhibit a in our comments and the supplemental excerpts of record. That's the Oliver Wyman study that does a global look both in the United States and international operations and assesses all of this. I mean, this is a case, frankly, of data versus anecdote. We put in massive amounts of data. We established powerfully that there's no safety benefit delivered by these types of laws. And the agency acted rationally and with substantive evidence in reaching the conclusion. Thank you. All right. That will conclude the arguments from respondents. We'll go back to rebuttal time for the petitioners. Whereas Miss Fineski, were you going to go first? Yes, Your Honor. All right. Go ahead. Thank you very much. I would like to address the Marshall case. As Judge Kristen correctly noted, our case is an APA case and Marshall was not an APA case. There was no suggestion in Marshall that the rule was late. There was no suggestion that the public lacked notice of what was at issue in that case, which was whether strobe lights on trains were effective at all. It was an above board rulemaking and commenters had plenty of opportunity to provide feedback to the agency. And based on that record, the agency decided that strobe lights should not be used. And the court in Marshall made a point to note that the FRA had studied the effectiveness of strobe lights for five years. In this case, of course, commenters never had notice that the agency was even contemplating a preemptive deregulatory rule. They had notice of the opposite, which was a rule that would affect the bar in terms of safety. Opposing counsel says you did have notice. He pointed me to page 5051. I'm sorry. Go ahead. I asked him that very question and you heard his response. Do you want to follow up? I believe the reference was to the agency's comment in the proposed rule that it's two person minimum rule would have preempted state laws that set a lower minimum. But there was no notice of the possibility that the agency would preempt state precise laws entirely and deregulate the area entirely. I'd also like to point out that the you know, none of the comments in this record addressed that scenario, that scenario where there's no no crew size minimum anywhere. If commenters had indeed had noticed that that was a possibility, surely they would have mentioned it. But not one did. Not even the Association of American Railroads comment. And to respond to another point that Mr. Dupree Can you point to me any cases where that that would give us guidance that that is something that you have to know that it has to be included in there on the since you acknowledge that they that the FRA can't they can't preempt. So how could they have done this? What what at a minimum, how could they have done this to how could they do it correctly and what the law requires? I don't have another case on this. Sure. I would I would refer the court to the cases we cite in our brief on the logical outgrowth concept. The agency has to provide meaningful notice of what it intends to do. Rulemaking is not a is not a gotcha type game. The agency is supposed to lay its own table and allow the public to provide input on what it is proposing. Of course, the agency can respond to comments in the record and change the proposed rule, but it can't do the type of complete 180 that it did here without ever having given the public an opportunity to weigh in. I'd also briefly like to address the timeliness cases, Peabody and the other cases that Mr. Totaro mentioned. OK, do it briefly because I gave you more time than I was supposed to. I got generous. But go ahead. Do it briefly. Thanks very much. None of those cases involved an agency rulemaking. They all involved adjudications either by a court or an agency. And the question was whether a deadline was jurisdictional. Here, this is a legislative rulemaking where the agency is trying to change the law. And again, the statute is clear for whatever reason, whether it was a concern about staleness, Congress imposed that 12 month deadline. And that's that could not be clearer in the statute. Thank you. Thank you. All right. Mr. Browder, you have some time left on the clock. OK, I am mindful of the court's time, and I understand that we are running a little bit long, but I do just want to make a few points. One, with regard to the original 2016 proposed rulemaking, the other side basically said that there was no evidence that two was better than one. That's not correct. There was plenty of evidence in that 150 page about how difficult the job is. There are 145 tasks that have to be accomplished in operating the train. There's problem solving. There's all, any number of things that really, the impetus of the rule, that really provided that this probably should be the default, that two should be the default and one should be the exception. That's the way the rule was laid out. That's the way the notice went. Well, Mr. Dupree said, Mr. Dupree, Mr. Browder, Mr. Dupree told me I shouldn't be worried that trains will be operating with no one on them because of all the collective bargaining agreements. Is that something that should give me comfort or what? What's your response to that? I suppose that for the time being, that may give you some comfort, but that's not. Is it sufficient to vet the issue? I guess. Should I even be looking at that? No, I think it's something the court should be concerned with. At some point right now, we are in the midst of negotiation on the next round of crew consents, the size of crews. The carriers have been trying to push the idea of going to a one-person crew or perhaps even no one on the train. It's fairly in the near future. So it is something the court should be concerned with. Counselor, are you aware of the case of Mine Workers of America versus Mine Safety and Health Administration? The APA was satisfied here. I don't see anywhere that the collective bargaining is an issue, that that's something that could satisfy the APA. Correct, Your Honor. The APA issue is different from the collective bargaining. Okay. Counselor, I was just asking, and I think we talked over each other. Forgive me. I'm just going to the logical outgrowth issue. Are you aware of the case that I just mentioned, Mine Workers of America versus Mine Safety? I have to admit, Your Honor, that I have not read that case. No problem. That's fine. Thank you. With regard to the follow-up on Judge Kristin's earlier question to Mr. Dupree on the number of states that have enacted something, I believe it's nine or ten at the time of the withdrawal that had enacted something. There were also proposed in 30 other states, proposed rules with regard to crew staffing. And with regard to the data submitted by the AAR, I think it's important to note that the AAR's data was paid for by the AAR. So they paid for a study. And when you pay for a study, you're looking for a specific result, and that's the result they got. That doesn't necessarily mean that that's what actually is going on. With that, I have no further comment. Okay. Do either of my colleagues have additional questions that they want to ask? No, but I want to thank all counsel for your patience. Yes. Thank you, counsel. It was all very helpful for us. And we thank you for appearing remotely and being so well prepared. This matter will now stand submitted. And this court will be in recess until tomorrow at 930. And I assume that our technical people will transfer the judges to the roving room. So we'll hold on.
judges: Callahan, Christen, Rakoff